**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CYBERSECURE IPS LLC,

    Plaintiff,

    v.

NETWORK INTEGRITY SYSTEMS, INC.,

    Defendant.

Civil Action No. 25-1940-TDC

**MEMORANDUM OPINION**

Plaintiff CyberSecure IPS LLC ("CyberSecure") has filed this civil action against Defendant Network Integrity Systems, Inc. ("NIS") in which it alleges fraud and breach of contract arising out of a 2023 agreement between the parties relating to their intellectual property. NIS has filed a Motion to Dismiss the Second Amended Complaint, which is fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

The following relevant facts alleged in the operative complaint and its exhibits are accepted as true for purposes of resolving the Motion.

**I.    The ESR Agreement**

CyberSecure and NIS are both in the business of providing cybersecurity technology and services. On or about October 1, 2015, the two companies entered into an Exclusive Strategic Relationship Agreement ("the ESR Agreement"), in which they agreed to integrate their products and services in order to market them to customers and granted to each other the right to market

and sublicense certain NIS products, including those known as "Interceptor" or "Vanguard," as integrated with a CyberSecure hardware and software system known as its "Infrastructure Monitoring System," collectively referred to as the "Solutions." ESR Agreement §§ 1.2, 1.5, First Am. Compl. Ex. A, ECF No. 18-1.

The ESR Agreement set forth the terms by which this cooperation would take place while protecting each company's intellectual property. As relevant here, NIS agreed in section 5.2 of the ESR Agreement "not to design, develop, manufacture, private label, or offer for sale, any product that can reasonably be considered to perform and/or provide the same functionality as the [CyberSecure] hardware and software Products included as part of the Solution." *Id.* § 5.2. NIS also agreed, in section 5.4 of the ESR Agreement, "not to modify, revise, iterate, or customize NIS Products or develop new versions of NIS Products to effect or support the interoperability of NIS Products with products that can reasonably be considered to perform and/or provide the same functionality in the Market as the [CyberSecure] hardware and software Products included as part of the Solution." *Id.* § 5.4. Section 6.3 of the ESR Agreement stated that any inventions "created by one party while working with the products or services of the other party as part of the Solution and within the domain of the other party and its products or services, shall be passed to said second party for implementation and ownership" of the associated intellectual property rights. *Id.* § 6.3.

The ESR Agreement also governed the procedures for terminating the agreement and curing a breach. Specifically, the ESR Agreement provided that, in the event of a material breach by either party, the non-breaching party had "the right to terminate this Agreement, provided that such Party notifie[d] that other Party in writing of such material breach" and provided that party ten days to cure the breach. *Id.* § 4.2. In accordance with this provision, on April 26, 2023, CyberSecure sent to NIS a letter providing notice of the termination of the ESR Agreement ("the

2

Notice of Termination"), which alleged that NIS had breached sections 5.2 and 5.4 and other provisions of the ESR Agreement by "designing, developing, modifying and/or revising products that provide the same functionality as [CyberSecure] Products that are part of the Solutions, and/or support the interoperability of NIS products with other products that provide the same functionality as CyberSecure products." Notice of Termination at 1, Compl. Ex. A, ECF No. 3. In the Notice of Termination, CyberSecure demanded that NIS cure the breach by assigning certain patents to CyberSecure pursuant to section 6.3 of the ESR Agreement. On May 2, 2023, NIS responded to the Notice of Termination by stating that it agreed to assign the rights to three patents to CyberSecure in order to cure the breaches of the ESR Agreement.

## II.    The Letter Agreement

On May 5, 2023, CyberSecure responded to NIS with a letter ("the Letter Agreement") "set[ting] forth specific terms upon which it would agree that NIS had 'cured' the breaches of the ESR Agreement," which NIS then agreed to and signed the same day. Second Am. Compl. ("SAC") ¶ 19, ECF No. 24. Pursuant to the Letter Agreement, NIS agreed to assign 13 specified patents or patent applications to CyberSecure. NIS also agreed to conduct an internal audit to review of all of its intellectual property and provide to CyberSecure an affidavit describing the scope of the internal audit and "admitting or denying that NIS possesses any internal development documents, unpatented and copyrightable inventions, software and applications . . . , images, schematics, protocols and/or prototypes, additional patents and other materials," other than those assigned through the Letter Agreement, that were "similar to or that provide[d] the same functionality as [CyberSecure] Products that are part of the Solutions, and/or support the interoperability of NIS products with other products that provide the same functionality as CyberSecure products." Letter Agreement at 1, Compl. Ex. C, ECF No. 3. NIS also agreed to

permit an "independent external audit of NIS's patent portfolio and products in development" if requested by CyberSecure. *Id.* at 2. If any patents, patent applications, or "derivative developments" meeting the above description were uncovered by the internal or external audits, NIS agreed to assign them to CyberSecure. *Id.*

Pursuant to the Letter Agreement, NIS provided to CyberSecure affidavits from NIS's Chief Executive Officer, Joseph Giovannini, and its Chief Technology Officer, Cary Murphy (respectively, "the Giovannini Affidavit" and "the Murphy Affidavit"). In his affidavit, Giovannini stated that he "personally supervised a review of all of NIS's intellectual property including all patent filings and internal invention disclosures," which encompassed "all of NIS's development work since the commencement of the [ESR] Agreement." Giovannini Aff. ¶ 3, Compl. Ex. D, ECF No. 3. Giovannini stated that this review led to the identification of two additional patents and certain conceptual work, none of which related to NIS products or potential products with the same functionality as CyberSecure products. Accordingly, Giovannini concluded that NIS did not possess any "additional patents and other materials, not set forth in the [Letter Agreement], similar to or that provide the same functionality" as CyberSecure products or that support the interoperability of NIS products with such products. *Id.* ¶ 6.

In his affidavit, Murphy stated that he "reviewed every engineering project that the NIS research and development team has worked on since April 1, 2015 or is currently working on" and identified additional conceptual work, but stated that none of it "would have resulted in products that have the same functionality as [CyberSecure products] and none of these ideas ha[d] been incorporated into any NIS commercial products." Murphy Aff. ¶¶ 2–3, Compl. Ex. E, ECF No. 3. Accordingly, Murphy concurred with Giovannini that NIS possessed no additional patents, inventions, software and applications, internal development documents, or other materials that

were similar to or provided the same functionality as CyberSecure products or that supported the interoperability of NIS products with such products.

### III.    The Patent Infringement Case

Almost two years later, on April 7, 2025, NIS filed a civil action, *Network Integrity Systems, Inc. v. CyberSecure IPS LLC*, in the United States District Court for the Eastern District of Virginia ("the Patent Infringement Case").  In the complaint in the Patent Infringement Case ("the Patent Infringement Complaint"), NIS alleged patent infringement by CyberSecure, specifically of U.S. Patent No. 7,706,641 ("the '641 Patent"), which is entitled "Monitoring Individual Fibers of an Optical Cable for Intrusion" and was issued by the United States Patent and Trademark Office ("PTO") on April 27, 2010.  *See* Patent Infringement Compl. ¶ 12, Compl. Ex. F, ECF No. 3.  Based on the '641 Patent, NIS manufactures and sells two products, the Interceptor and the Vanguard, used as part of cybersecurity systems for detecting attempted network intrusions by receiving and monitoring light signals from optical fibers.  In the Patent Infringement Complaint, NIS alleged that CyberSecure "did not have a product that competed with the NIS Interceptor and Vanguard devices" until after the two companies' relationship ended in 2024, when CyberSecure incorporated the functionality of those two NIS products into its new Opti-Guard product.  *Id.* ¶ 22.  NIS also alleged that CyberSecure offers at least three intrusion detection systems and methods that infringe the '641 Patent: a system used in data centers to detect intrusions with a "point-to-multipoint network layout," *id.* ¶ 26, a system for monitoring intrusions into a protected distribution system in a secure government facility in or near Washington, D.C., and a system using CyberSecure's Controller, Opti-Guard, and Cyber Sensor products for "monitoring intrusions of manholes, lockboxes, and other purposes." *Id.* ¶ 37.

5

On June 18, 2025, the Patent Infringement Case was transferred to this Court and is designated as No. 25-1974-TDC. With its Answer to the Patent Infringement Complaint, CyberSecure filed six counterclaims against NIS: a claim seeking a declaratory judgment of the invalidity of the '641 Patent; a claim seeking a declaratory judgment of CyberSecure's non-infringement of the '641 Patent; and four claims of infringement of CyberSecure patents, specifically U.S. Patent Nos. 11,515,940, 11,388,181, 9,455,999, and 11,367,342. The Patent Infringement Case is presently in discovery.

## IV.    The '641 Patent and the '045 Application

According to CyberSecure's Second Amended Complaint in the present case, the technologies that formed the basis for NIS's claims of infringement of the '641 Patent in the Patent Infringement Case were part of the Solutions under the ESR Agreement, such that the Letter Agreement obligated NIS to identify the '641 Patent and assign it to CyberSecure. Specifically, CyberSecure alleges that its Manhole Protection System, which is referenced by NIS in the Patent Infringement Complaint and its exhibits, "was part of the Solutions and has always been established as a CyberSecure product," and that prior to the ESR Agreement, the Manhole Protection System was included in CyberSecure's Infrastructure Monitoring System. SAC ¶ 29. Because NIS sold the Infrastructure Monitoring System pursuant to the ESR Agreement, it was obligated to identify and transfer patents, like the '641 Patent, that "provide the same or similar functionality" to that CyberSecure product. *Id.* In further support of this argument, CyberSecure alleges that the Manhole Protection System utilized Fiber Bragg Grating sensor technology during the pendency of the ESR Agreement, which NIS also cited in the Patent Infringement Complaint as a basis for its infringement claim.

CyberSecure also alleges that the "deployment[s] of point-to-multipoint, full daisy-chain, and split daisy-chain layouts," which NIS cited in the Patent Infringement Complaint as a basis for its infringement claim against CyberSecure, "were part of the Solutions under the ESR Agreement and were deployed for customers jointly by the Parties," thus providing another basis for CyberSecure's claim that NIS was obligated under the Letter Agreement to identify and assign to CyberSecure the '641 Patent as similar to or providing the same functionality as a CyberSecure product. *Id.* ¶¶ 31–32.

Beyond the '641 Patent, CyberSecure makes similar allegations relating to Patent Application No. US-20230236045 ("the '045 Application"), which NIS submitted to the PTO before it signed the Letter Agreement and submitted the Giovannini and Murphy Affidavits. CyberSecure alleges that the '045 Application was within the scope of the Letter Agreement, and should have been transferred to CyberSecure, because it "is similar to or provides the same functionality" as CyberSecure's Infrastructure Monitoring System, which "monitors environmental factors, like temperature, using a self-adjusting time-based algorithm to filter out ambient noise to reduce false alarms" and was part of the Solutions pursuant to the ESR Agreement. *Id.* ¶ 34.

Nevertheless, the '641 Patent and the '045 Application were not assigned in the Letter Agreement and were not identified in the Giovannini and Murphy Affidavits. According to CyberSecure, the affidavits thus "misrepresented" that the '641 Patent and the '045 Application "were not within the scope of the Letter Agreement," which constituted a breach of that agreement. *Id.* ¶ 36. CyberSecure further alleges that it relied on those misrepresentations in the Giovannini and Murphy Affidavits when it later released NIS from claims relating to breaches of the ESR Agreement and that it was thus misled into believing that the Letter Agreement had eliminated any

risk that NIS would bring infringement claims against CyberSecure, as it did in the Patent Infringement Case.

## V.    Procedural History

On May 8, 2025, about one month after NIS filed the Patent Infringement Case, CyberSecure filed the original Complaint in this case in the Circuit Court for Montgomery County, Maryland and attached as exhibits the Notice of Termination, the responsive NIS letter, the Letter Agreement, the Giovannini Affidavit, the Murphy Affidavit, and NIS's Patent Infringement Complaint.  NIS removed the case to this Court, after which CyberSecure amended the complaint twice, including by attaching the ESR Agreement as an exhibit to the First Amended Complaint. In the presently operative Second Amended Complaint, CyberSecure alleges three state law claims in the following numbered counts:  (1) a claim of fraud based on the alleged misrepresentations in the Giovannini and Murphy Affidavits, for which CyberSecure seeks damages; (2) a claim of breach of contract of the Letter Agreement on the same basis, for which CyberSecure seeks damages and the assignment to it of the '641 Patent and the '045 Application; and (3) a claim seeking a declaratory judgment that the Letter Agreement entitles CyberSecure to any damages claimed by NIS in the Patent Infringement Case, as well as reimbursement from NIS for any attorney's fees and costs incurred by CyberSecure in that case.

## DISCUSSION

In its Motion, NIS seeks dismissal of all claims pursuant to Federal Rule of Civil Procedure 13(a) on the grounds that they constitute compulsory counterclaims that had to be asserted in the Patent Infringement Case, and pursuant to Rule 12(b)(6) on the grounds that the Second Amended Complaint has failed to allege sufficient facts to support plausible claims for relief.  In the alternative, NIS seeks a stay of this case until after the resolution of the Patent Infringement Case.

## I.      Rule 13(a) Motion to Dismiss

NIS first seeks dismissal of the Second Amended Complaint on the grounds that all of the claims are compulsory counterclaims that had to be, but were not, asserted in the Patent Infringement Case.

### A.      Legal Standard

Pursuant to Rule 13(a), and subject to exceptions not relevant here, a "pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against the opposing party" if the claim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). The compulsory counterclaim rule aims "to prevent the relitigation of the same set of facts" and advances "judicial economy, convenience and fairness to litigants." *Painter v. Harvey*, 863 F.2d 329, 332 (4th Cir. 1988) (citations omitted).

If the "claim and counterclaim straightforwardly arise out of the same transaction or occurrence" such that "the shared subject matter giving rise to the parties' claims is evident," then the counterclaim is found to be compulsory without the need for further inquiry. *Honeywell Int'l Inc. v. OPTO Elecs. Co., Ltd.*, 135 F.4th 170, 177 & n.2 (4th Cir. 2025). For less straightforward contexts, the United States Court of Appeals for the Fourth Circuit has identified four questions to consider in determining whether a claim is a compulsory counterclaim:

(1)     Are the issues of fact and law raised in the claim and counterclaim largely the same?

(2)     Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule?

(3)     Will substantially the same evidence support or refute the claim as well as the counterclaim? and

(4)     Is there any logical relationship between the claim and counterclaim?

*Painter*, 863 F.2d at 331; *see Charlotte-Mecklenburg Cnty. Bd. of Educ. v. Brady*, 66 F.4th 205, 215 (4th Cir. 2023). These inquiries are "less a litmus, more a guideline," and the "court need not answer all these questions in the affirmative for the counterclaim to be compulsory." *Painter*, 863 F.2d at 331. The third inquiry is primary and often dispositive, because if "the same evidence will support or refute both the claim and counterclaim, the counterclaim will almost always be compulsory." *Id.* at 332; *see Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 299 (4th Cir. 2003) (stating that "evidentiary similarity is the most important inquiry"). However, a "counterclaim may still arise from the same 'transaction or occurrence' . . . as a logically related claim even though the evidence needed to prove the opposing claims may be quite different." *Painter*, 863 F.2d at 332.

If a claim is found to be a compulsory counterclaim in another pending federal suit, the court "will stay its own proceedings or will dismiss the claim with leave to plead it in the prior action." *Aaron Fine Arts v. O'Brien*, 244 F.R.D. 294, 297 (D. Md. 2007) (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1418 (2d ed. 2007)). If the prior action is in another district in which venue is proper, the court may transfer the case pursuant to 28 U.S.C. § 1404(a). *See id.* at 296.

### B.    Compulsory Counterclaims

In *Honeywell International, Inc. v. OPTO Electronics Co., Ltd.*, 135 F.4th 170 (4th Cir. 2025), the Fourth Circuit considered whether it was required to dismiss an appeal pursuant to a statute granting to the United States Court of Appeals for the Federal Circuit exclusive appellate jurisdiction over cases in which a claim or compulsory counterclaim arising under patent law was asserted. *Id.* at 176. In that case, the plaintiff sued the defendant for breach of a licensing agreement granting the defendant the right to use the plaintiff's patents in exchange for royalties,

10

on the grounds that certain barcode readers sold by the defendant fell within the scope of the agreement and thus required royalty payments to the plaintiff. *Id.* at 174. The defendant brought various counterclaims, including one seeking a declaratory judgment that the plaintiff's conduct in seeking to bring the barcode readers within the scope of the licensing agreement constituted patent misuse and that its patents were therefore unenforceable. *Id.* In concluding that this counterclaim was compulsory, and therefore that it lacked jurisdiction over the appeal, the Fourth Circuit relied on the fact that the breach of contract claim and the patent misuse counterclaim arose out of the same licensing agreement. *Id.* at 176–77 (applying Rule 13(a) standards). The court further stated that "to resolve [the defendant's] patent-misuse counterclaim, we would need to compare the scope of the licensing agreement to the scope of [the plaintiff's] underlying patents," and "[h]alf the subject matter of that comparison, of course, is the licensing agreement." *Id.* at 177. Because "the shared subject matter giving rise to the parties' claims" was "evident," the court readily concluded that the counterclaim was compulsory. *Id.* at 177 n.2.

The same logic governs here. In the Patent Infringement Case, NIS has asserted claims of infringement of the '641 Patent, and here CyberSecure has asserted claims of breach of contract and fraud, both premised in significant part on alleged misrepresentations relating to the '641 Patent in the affidavits supplied by NIS pursuant to the Letter Agreement. Key questions in both cases, including whether the '641 Patent was infringed and whether the Giovannini and Murphy Affidavits contained misrepresentations about the '641 Patent, turn on the scope and characteristics of the '641 Patent and the extent of its similarity to CyberSecure's products. As in *Honeywell International*, to resolve CyberSecure's claims in this case, the Court will need to compare the scope of the parties' agreement to the scope of NIS's intellectual property, and "[h]alf the subject matter of that comparison" is the '641 Patent at issue in the Patent Infringement Case. *See id.* at

11

177. The claims in these two cases thus "straightforwardly arise out of the same transaction or occurrence," and their "shared subject matter . . . is evident." *Id.* at 177 & n.2. CyberSecure's claims are therefore compulsory counterclaims that had to be filed in the Patent Infringement Case.

Although CyberSecure has based its claims on alleged misrepresentations relating not only to the '641 Patent but also to the '045 Application, the alleged acts of misrepresentation by NIS personnel are co-extensive, and CyberSecure has pleaded only one claim each of fraud and breach of contract. Even considering the inclusion of the additional allegations relating to the '045 Application, the Court finds that the claims remain compulsory counterclaims. For this analysis, the Court applies the four-factor test originally set forth in *Painter*. *See Painter*, 863 F.2d at 331. As for the third and most important factor, whether substantially the same evidence will support or refute the claim and the counterclaim, the Court finds that it weighs in favor of the conclusion that CyberSecure's claims are compulsory counterclaims because, as stated above, the resolution of those claims will require an examination of the scope of NIS's intellectual property in relation to the scope of CyberSecure's intellectual property. Specifically, according to the Patent Infringement Complaint, CyberSecure offers several products that infringe the '641 Patent, including the Manhole Protection System, and according to the Second Amended Complaint in this case, there was a breach of contract and fraud because both the '641 Patent and the '045 Application are similar to or provide the same functionality as CyberSecure products, including CyberSecure's Infrastructure Monitoring System and the Manhole Protection System. Therefore, where NIS's claims in the Patent Infringement Case will require a technical analysis of specific CyberSecure products such as the Manhole Protection System in order to assess whether they infringe the '641 Patent, and CyberSecure's claims in this case will require a similar analysis and

comparison to both the '641 Patent and the '045 Application, there is significant overlap of the evidence underlying the claims in both cases. *See Painter*, 863 F.2d at 332.

As for the other factors, the first, whether the issues of fact and law are largely the same, weighs slightly against a conclusion that the claims are compulsory because, while some of the same factual issues relating to the similarities of CyberSecure and NIS products will arise in both cases, other factual issues such as the interpretation of the terms of the Letter Agreement and the mental states of Giovannini and Murphy would likely arise only in the present case, and the two complaints invoke different causes of action. The second factor, whether *res judicata* would operate to bar CyberSecure's claims in the absence of Rule 13(a), also appears to weigh in favor of CyberSecure's position, if only because there has not been a final judgment in the Patent Infringement Case. *See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (stating that the application of *res judicata* requires "a final judgment on the merits in a prior suit"). However, the fourth factor, like the third, supports the conclusion that CyberSecure's claims are compulsory counterclaims because the claims in the two cases plainly are logically related: the Patent Infringement Case alleges that CyberSecure's products are too similar to NIS's intellectual property, and the present case alleges that NIS failed to disclose the fact that such similarities existed and, in doing so, breached their contract and committed fraud. Indeed, CyberSecure acknowledges in the Second Amended Complaint that its claims logically flow from NIS's allegations in the Patent Infringement Case. SAC ¶ 8. Further, CyberSecure's present claim that CyberSecure is entitled to any damages NIS is awarded in the Patent Infringement Case underscores this logical relationship. On balance, and with due weight afforded to the third and primary factor, the factors lead to the conclusion that all of CyberSecure's claims are compulsory counterclaims in the Patent Infringement Case.

Accordingly, the Court finds that CyberSecure's claims in this case are compulsory counterclaims to NIS's claims in the Patent Infringement Case and should have been pleaded there. Because the Patent Infringement Case is still pending before this Court, the Court will dismiss CyberSecure's claims and grant leave to file them in that case. *See Aaron Fine Arts*, 244 F.R.D. at 297. The Court notes that, even if it had found that CyberSecure's claims are not strictly compulsory under Rule 13(a), it would have found that, where the two cases involve the same parties, are pending before the same Court, are proceeding on similar timelines, and involve significantly overlapping evidence, this case should be consolidated with the Patent Infringement Case for purposes of judicial economy.

## II.   Rule 12(b)(6) Motion to Dismiss

Even though the Court will dismiss CyberSecure's claims in this case pursuant to Rule 13(a) and grant leave to file them in the Patent Infringement Case, it is appropriate to address NIS's arguments for dismissal pursuant to Rule 12(b)(6) here to avoid an unnecessary round of motions practice in the other case.

### A.   Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## B.    Mutual Releases

NIS asserts that all claims in the Second Amended Complaint must be dismissed because CyberSecure released NIS from such claims when it signed two agreements containing mutual release provisions.    In the first, a "Termination of Agreement and Mutual Release" ("the Termination Agreement") attached as an exhibit to a June 23, 2023 Memorandum of Understanding between the parties, NIS and CyberSecure terminated the ESR Agreement and agreed that they "hereby release and discharge each other . . . from, and hereby waive and covenant not to bring any action against each other regarding, any and all claims . . . or causes of action of every kind and nature, whether foreseen or unforeseen, contingent or actual, liquidated or unliquidated, known or unknown, whether in tort or contract or otherwise, which the undersigned may have against each other . . . from the beginning of time up to and including" June 23, 2023. *See* Termination Agreement ¶ 2, Mem. of Understanding Ex. A, Mot. Dismiss Ex. 1, ECF No. 27-2.    In the second, a "Settlement Agreement" dated September 6, 2024, NIS and CyberSecure mutually agreed to release one another from all claims that "relate in any way, directly or indirectly to the facts, acts, events, transactions, occurrences . . . or other matters . . . "in any way arising out of" the June 23, 2023 Memorandum of Understanding.  *See* Settlement Agreement § II.C.1, Mot. Dismiss Ex. 2, ECF No. 27-3.  NIS attached both agreements to the Motion to Dismiss.

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea*

*Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).

Here, CyberSecure does not dispute the authenticity of the submitted Termination Agreement and Settlement Agreement, but it asserts that the Court should not consider them at the motion-to-dismiss stage because they are not integral to the complaint. The Second Amended Complaint, however, alleges in multiple places that "CyberSecure entered into agreements with NIS in which it released NIS from claims based on the misrepresentations made in the Letter Agreement and affidavits." SAC ¶ 44; *see also id.* ¶ 54 (referencing "subsequent agreements with NIS, including but not limited to, the release of claims it had against NIS for breach of the ESR"). Where such allegations were offered to provide support for CyberSecure's fraud claim and where CyberSecure does not dispute NIS's assertion in the Motion that such allegations refer to the releases in the Termination Agreement and the Settlement Agreement, the repeated references to the releases are sufficient to establish that the Termination Agreement and the Settlement Agreement are integral to and expressly relied on by the Second Amended Complaint. The Court therefore may consider them in resolving the Motion.

However, the Court will not grant the Motion based on the mutual releases because CyberSecure alleges that the misrepresentations by NIS personnel induced CyberSecure into releasing NIS from claims, which, at this stage, suffices as factual support for an allegation that the mutual releases in the Termination Agreement and the Settlement Agreement are unenforceable due to fraud. *See Parish v. Md. & Va. Milk Producers Ass'n*, 277 A.2d 19, 53 (Md. 1971) (stating that a release may be set aside if obtained by fraud). NIS asserts that this allegation fails to satisfy the requirement of Federal Rule of Civil Procedure 9(b) that "a party must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), which requires the plaintiff

to "allege 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Corder v. Antero Res. Corp.*, 57 F.4th 384, 401 (4th Cir. 2023) (quoting *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019)). CyberSecure, however, has met that requirement by alleging that the specific misrepresentations in the Giovannini and Murphy Affidavits induced it to agree to mutual releases.

### C.  Breach of Contract

NIS also seeks dismissal of the breach of contract claim in Count 2 on the grounds that the Second Amended Complaint fails plausibly to allege a breach of the Letter Agreement. In the Second Amended Complaint, CyberSecure alleges that the Giovannini Affidavit and the Murphy Affidavit each falsely stated that NIS possessed no additional patents or other intellectual property within the scope of the Letter Agreement, when in fact the '641 Patent and the '045 Application fell within the scope of the Letter Agreement and thus should have been disclosed and assigned to CyberSecure. According to CyberSecure, these "misrepresentations and omissions" in the two affidavits constituted the relevant breach for purposes its breach of contract claim of Count 2. SAC ¶ 51.

NIS asserts that the representations cannot constitute a breach of the Letter Agreement because the Letter Agreement required only the provision of an affidavit "admitting or denying" that NIS possesses certain patents or other development documents similar to or providing the same functionality as CyberSecure products that were part of the Solutions, *see* Letter Agreement at 1, and "did not contain any representations or warranties attesting one way or the other as to the truth or falsity of the affidavit." Mot. Dismiss at 13, ECF No. 27-1. However, the Letter Agreement, like "all negotiated contracts" governed by Maryland law, is subject to the implied covenant of good faith and fair dealing. *Tate v. Am. Gen. Life Ins. Co.*, 627 F. Supp. 3d 480, 493

17

(D. Md. 2022) (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000)). Pursuant to the covenant, each party "impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *Clancy v. King*, 954 A.2d 1092, 1109 (Md. 2008) (quoting *E. Shore Mkts., Inc.*, 213 F.3d at 184). Knowingly providing a false affidavit would plainly frustrate CyberSecure's right to benefit from its contract with NIS and would therefore breach NIS's implied duty of good faith and fair dealing. A breach of such duty is "an element of . . . breach of contract." *Mt. Vernon Props., LLC v. Branch Banking & Tr. Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006); *see Tate*, 627 F. Supp. 3d at 493. Where CyberSecure has alleged such a breach, the Motion will be denied as to this argument.

### D.    Duplicative Claims

NIS seeks dismissal of the fraud claim in Count 1 and the declaratory judgment claim in Count 3 on the grounds that they are duplicative of the breach of contract claim in Count 2. As to the fraud claim, NIS asserts that it should be dismissed because, like the breach of contract claim, it is premised upon alleged misrepresentations in the Giovannini and Murphy Affidavits. However, claims for fraud and breach of contract generally are legally distinct in that a fraud claim sounds not in contract, but in tort. *See* Restatement (Third) of Torts: Liab. for Econ. Harm ("Restatement") § 9 (2020). As NIS notes, certain tort claims, such as a negligence claim based on a breach of contract, cannot be raised separately from breach of contract claims. *See, e.g., Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1059 (Md. 1999) (stating that a claim for "negligent breach of a contract" cannot be raised as a tort claim absent the breach of a duty "imposed by law independent of that arising out of the contract itself" (quoting *Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961))). CyberSecure's fraud claim, however, asserts not a negligent

breach of a duty but an act of fraud, and thus may proceed separately. *See* Restatement § 9, cmt. a (stating that "the economic-loss rule generally forecloses tort liability for negligence in the . . . performance of a contract, but it does not impair the claims of fraud"). Indeed, plaintiffs often plead breach of contract and fraud claims arising out of the same facts, particularly when the fraud is based on a material misrepresentation of facts. *See, e.g., Nails v. S & R, Inc.*, 639 A.2d 660, 662 (Md. 1994) (considering a separate fraud claim based on a knowing misrepresentation of a past or present fact); *James v. Goldberg*, 261 A.2d 753, 757–58 (Md. 1970) (considering separate claims where the fraud consisted of "a fraudulent and deceitful representation by the defendant"); *cf. Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 649–50 (Md. 1992) (recognizing that a plaintiff may recover punitive damages for some tortious conduct, including fraud, arising out of a contractual relationship); *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20–21 (N.Y. App. Div. 1999) (in applying New York law, recognizing that if "the plaintiff's claim is that defendants intentionally misrepresented material facts," that "is fraud, not breach of contract"). The Court therefore will not dismiss the fraud claim in Count 1 as duplicative of the breach of contract claim in Count 2.

As for the declaratory judgment claim in Count 3, dismissal of such a claim is warranted "[w]hen declaratory relief would be duplicative of claims already alleged." *Chevron U.S.A. Inc. v. Apex Oil Co., Inc.*, 113 F. Supp. 3d 807, 824 (D. Md. 2015) (citation omitted). In this claim, CyberSecure reasserts that NIS has breached the Letter Agreement and committed fraud and thus duplicates the other claims. SAC ¶ 58. The relief sought in Count 3, a ruling that CyberSecure is entitled to the damages obtained by NIS in the Patent Infringement Case and attorney's fees and expenses incurred by CyberSecure in litigating that case, is already requested in relation to Counts 1 and 2 based on the same two causes of action cited in Count 3.

CyberSecure's assertion in its brief that the declaratory judgment claim differs from its breach of contract claim because it "concerns [NIS]'s conduct in suing for infringement," Opp'n at 18, ECF No. 28, is unpersuasive. First, the Second Amended Complaint describes the declaratory judgment claim only in terms of the existing breach of contract and fraud claims and thus is entirely inconsistent with CyberSecure's more recent position. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff cannot amend the complaint through assertions made in a brief on a motion to dismiss). Second, even if the claim were amended to match CyberSecure's new position, the claim would still fail because it is not grounded in any legally viable cause of action other than the existing breach of contract and fraud claims, and the Declaratory Judgment Act does not "provide a basis for an independent claim." *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 742 (D. Md. 2006); *see Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013) (stating that federal courts "treat a state court declaratory action that is removed as invoking the Federal Declaratory Judgment Act"). Accordingly, Count 3 will be dismissed.

### E.    Attorney's Fees

Finally, NIS seeks dismissal of CyberSecure's request to recover the attorney's fees it incurs in defending the Patent Infringement Case as damages in the present case. Under Maryland law, which follows the "American Rule," a prevailing party may not recover attorney's fees "unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution." *Thomas v. Gladstone*, 874 A.2d 434, 437 (Md. 2005). The third exception, known as the collateral litigation doctrine, "permits the court to award as damages the legal fees from [a] separate

litigation" where "the natural and probable consequence of a wrongful act has been to involve [the] plaintiff in litigation with others." *E. Shore Title Co. v. Ochse*, 160 A.3d 1238, 1256 (Md. 2017).

CyberSecure asserts that the collateral litigation doctrine permits its request for attorney's fees because it was reasonably foreseeable that NIS's failure to assign the '641 Patent and '045 Application pursuant to the Letter Agreement would lead NIS to sue CyberSecure for alleged patent infringement, thus causing CyberSecure to defend the lawsuit. However, as CyberSecure acknowledges, the doctrine "has only been applied in cases involving collateral litigation with third parties." Opp'n at 20. Applying the doctrine to permit recovery of attorney's fees in litigation between the same parties would impermissibly expand this exception, especially where the Court will dismiss the Second Amended Complaint with leave to re-file the claims in the Patent Infringement Case. *See E. Shore Title Co.*, 160 A.3d at 1254 ("Collateral litigation expenses are only recoverable 'for legal services in a separate litigation against another party' . . . and not the legal services rendered in the instant litigation." (quoting *Freedman v. Seidler*, 194 A.2d 778, 783 (Md. 1963))). CyberSecure also asserts that its request for attorney's fees is "appropriate as a measure of consequential damages" from the alleged breach of contract, Opp'n at 19, but where the Letter Agreement is silent as to attorney's fees, treating attorney's fees as ordinary consequential damages in a contract case would effectively displace the default American Rule that each party must pay its own fees. *See Thomas*, 874 A.2d at 437; *E. Shore Title Co.*, 160 A.3d at 1253–54. Therefore, the Motion will be granted as to the Second Amended Complaint's request for attorney's fees.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss the Second Amended Complaint will be GRANTED IN PART and DENIED IN PART. It will be granted in that (1) Count 3 will be

DISMISSED WITHOUT PREJUDICE as duplicative of Counts 1 and 2; (2) the request to recover attorney's fees from the Patent Infringement Case will be DISMISSED; and (3) the Second Amended Complaint will be DISMISSED WITHOUT PREJUDICE on the grounds that the claims are compulsory counterclaims in the Patent Infringement Case, and CyberSecure will be granted leave to file Counts 1 and 2 as counterclaims in that case. The Motion will otherwise be denied. A separate Order shall issue.

Date: June 15, 2026

THEODORE D. CHUANG
United States District Judge